COPY

1  LAW OFFICES OF MARK A. REDMOND
2  Mark A. Redmond, Esq. SBN 161520(Ca.)
   Ian A. Scharg, Esq. SBN 285304(Ca.)
3  Plaza Five-Fifty-Five
   555 Capitol Mall, Suite 770
4  Sacramento, California 95814-4502
   Telephone: (916) 444-8240
5  Facsimile: (916) 444-8242
   Email: mr@markredmondlaw.com

6  SALISBURY LEGAL CORP.
7  Lawrence J. Salisbury, Esq. SBN 179748(Ca.)
   Andrew M. Greene, Esq. SBN 167386(Ca.)
8  Amber McKeon-Mueller, Esq. SBN 272623(Ca.)
   656 Fifth Avenue, Suite R
9  San Diego, California 92101
   Telephone: (619) 241-2760
10 Facsimile: (619) 241-2752
   Emails: lsalisbury@salisburylegal.com

11

12 Attorneys for Plaintiffs Rachel Cohen; Kim DeMelo; Julia Edging; Lucia Garcia;
   Lindsey Marino; and Jennifer Palabrica

13

14          UNITED STATES DISTRICT COURT

15       FOR THE CENTRAL DISTRICT OF CALIFORNIA

16 United States Of America, ex rel; Rachel    Case No. LACV14-7354 MWF (R2x)
   Cohen; Kim DeMelo; Julia Edging; Lucia
17 Garcia; Lindsey Marino; and Jennifer        **COMPLAINT FOR MONEY
   Palabrica,                                  DAMAGES AND CIVIL PENALTIES
18                                             FOR VIOLATIONS OF THE
                    Plaintiffs,                FEDERAL FALSE CLAIMS ACT
19 v.                                          AND THE CALIFORNIA FALSE
                                               CLAIMS ACT**
20 Premier B.H. Inc.; M.O. Jacob Health
   Care Center, LP; Jacob Health Care          **FILED UNDER SEAL**
21 Center, LP; Community Convalescent
   Hospital Of La Mesa dba Community           **PURSUANT TO FEDERAL FALSE
22 Care Center Of La Mesa; M.O.                CLAIMS ACT, AS AMENDED, 31
   Community Convalescent Hospital Of La       U.S.C. § 3729 et. seq.**
23 Mesa, LP; Eldorado Care Center, LP;
   Paramount Meadows Nursing, LP;              **JURY TRIAL DEMANDED**
24 Norwalk Meadows Nursing Center, LP;
   Pasadena Meadows Nursing Center, LP;
25 Panorama Meadows Nursing Center, LP;
   Meadows Management, Inc.; Jacob
26 Health Care Advisors, LLC; Pnina Graff;
   and Jacob Graff,
27                  Defendants
28

Plaintiffs, United States Of America, *ex rel;* Rachel Cohen; Kim DeMelo; Julia Edging; Lucia Garcia; Lindsey Marino; and Jennifer Palabrica (collectively, "Plaintiffs") bring this *Qui Tam* action against Premier B.H. Inc.; M.O. Jacob Health Care Center, LP; Jacob Health Care Center, LP; Community Convalescent Hospital Of La Mesa dba Community Care Center Of La Mesa; M.O. Community Convalescent Hospital Of La Mesa,  LP; Eldorado Care Center, LP; Paramount Meadows Nursing, LP; Norwalk Meadows Nursing Center, LP; Pasadena Meadows Nursing Center, LP; Panorama Meadows Nursing Center, LP; Meadows Management, Inc.; Jacob Health Care Advisors, LLC; Pnina Graff; and Jacob Graff, (collectively, "Defendants") to recover treble damages and penalties pursuant to the federal False Claims Act, as amended, 31 U.S.C. § 3729 *et. seq.,* (the "FCA") and the California False Claims Act, Cal. Gov. Code §12650*, et seq.* (the "CFCA")*,* and allege as follows:

## **INTRODUCTION**

1.      This is a *Qui Tam* action brought by Plaintiffs for themselves and on behalf of the United States to recover treble damages and penalties arising from Defendants' knowing submission of thousands of false claims to the Medicare and Medicaid programs for services they purported to provide to residents of Jacob Healthcare Center ("JHC"), Community Care Center of La Mesa, El Dorado Care Center, Norwalk Meadows Nursing Center, Paramount Meadows Nursing Center (collectively, "the Premier SNFs").  On information and belief, the Premier SNF's are all owned and operated by one or more of the various limited partnership defendant entities and/or their parent company, defendant Premier B.H., Inc. ("Premier").

2.      California has enacted extensive regulations covering the scope of residents appropriate at licensed skilled nursing facilities ("SNF" or "SNFs"), including the Premier SNFs.   These facilities are licensed to care only for residents who require a certain level of care and are paid to provide care for these residents

from various sources including a resident's private insurance company, Medi-Cal and Medicare.  Notwithstanding, the Premier SNFs fraudulently increased the number of their Medicare residents – many of whom did and do not even qualify for SNF-level of care.  And while the Premier SNFs routinely billed Medicare and Medi-Cal for thousands and thousands of reimbursement dollars on a monthly basis for residents who did not require SNF care, many of the services billed for were either unnecessary or not actually provided, and included billings for patients who were actually bribed or otherwise talked into staying in Premier SNFs solely in the interest of maximizing such patients' Medicare and/or Medi-Cal eligibility.  In addition, the Premier SNFs regularly provided insufficient and/or inadequate care for residents, placing them in substantial and unreasonable risk of harm and resulting in multiple resident deaths, bodily harm and unnecessary pain, suffering, disease and illness.

3.      Since at least March 2007 while one or more Plaintiffs were employed at JHC, and, on information and belief, and continuing through today, Defendants actively recruited residents with Medicare and/or Medi-Cal coverage yet which had either no need for SNF services and/or required services for which the Premier SNFs could not provide, and then provided residents with inadequate care.  In addition, Defendants pressured their Medicare and/or Medi-Cal residents to maximize the length of their stays (and thus maximizing Defendants' Medicare and/or Medi-Cal profits)  – even when such stays were unnecessary or directly against the best interests/wishes of their residents.   Often such residents were bribed by Defendants to stay longer thus unnecessarily fully depleting such residents' Medicare and/or Medi-Cal eligibility and in contravention of such residents' actual healthcare needs. Defendants also falsely increased their Medicare Resource Utilization Group ("RUG") scores so they could collect higher Medicare reimbursements than to which they were otherwise entitled.

4.      While Defendants actively recruited Medicare and/or Medi-Cal residents wholly inappropriate for their SNF facilities and then failed to provide for them

adequately, at the same time they sought and received hundreds of thousands of dollars in Medicare and/or Medi-Cal reimbursements and concealed their failures in care from the Government auditors and inspectors who visited the facilities from time to time. Defendants' concealment acts included, but are not limited to:

(a)    Forgery and destruction of medical documents and staffing and medical logs to falsely state that residents were receiving proper care, and their prescribed medications;

(b)    Instructing nursing staff not to log or to alter negative information relating to the health and care of their patients, such as when residents did not receive their meals or prescribed medications or physical therapy treatments and incidents where residents fell or suffered other bodily harm, among others.

(c)    In the event a nurse or certified nursing assistant ("CNA") charted such information, Defendants routinely would literally rip these pages out from the medical records and logs and then "re-chart" them with more favorable information, forging the nurses' signatures on the newly created documents.

(e)    Defendants' failure of care and efforts to conceal their failures in care have persisted from at least 2007 and continuing through the present.

5.    The unnecessary services provided by Defendants to residents of the Premier SNFs and to residents wholly inappropriate for SNF services, resulted in the submission of thousands of false claims to the federal Medicare program and the Medi-Cal program.  Defendants, at all times, knew or should have known or acted in reckless disregard that such claims were worthless or of such diminished value, that the United States and State of California would not have paid the claims, but for Defendants' misrepresentation and fraud.

/ / /

COMPLAINT

6.    In connection with the filing of this Complaint, Plaintiffs have furnished the United States and State of California with the Disclosure Statement required by 31 U.S.C. § 3730(b)(2) consisting of substantially all of the information in their possession relating to their claims.

7.    Plaintiffs are the original source of the facts and information contained in this Complaint and will voluntarily provide that information to the Federal and California government in conjunction with filing this action.

## JURISDICTION AND VENUE

8.    This is a civil action arising under the laws of the United States, and specifically, the "False Claims Act" or "FCA."   This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337.

9.    Venue is proper in this district pursuant to 31 U.S.C. § 3732 and 28 U.S.C. § 1391 because Defendants committed acts prohibited by 31 U.S.C.§ 3729(a) in this district, including their submission of false claims for payment as described herein to the various Government agencies and contractors, including the United States Department of Health and Human Services, Centers for Medicare and Medicaid Services.  Further, Defendants maintain a business office and other facilities in this district and also actively advertises the services at issue in this Complaint in this district.

## THE PARTIES

10.    Plaintiffs Jennifer Palabrica, Rachel Cohen, Julia Edging, Lucia Garcia, Lindsey Marino, and Kim DeMelo (collectively, "Plaintiffs") are citizens of the United States and residents of the State of California.

11.    Plaintiff Jennifer Palabrica is a Licensed Vocational Nurse ("LVN"). She was employed by Defendants as a Minimum Data Set ("MDS") Coordinator and/or a MDS Assistant from April 2010 through April 2014.

/ / /

/ / /

COMPLAINT

12.     Plaintiff Rachel Cohen was employed as a Central Supply and Driver and/or MDS Data Entry Clerk and/or a Medical Records Clerk by Defendants from June 2010 through October 2013.

13.     Plaintiff Lucia Garcia was employed as Medical Records Director and Assistant by Defendants from March 2007 through August 2013.

14.     Plaintiff Lindsey Marino was employed by Defendants as, among other things, a Social Services Designee from February 2010 through her termination on December 30, 2013.

15.     Plaintiff Kim DeMelo was employed by Defendants as Director of Social Services in December 2009.  Ms. DeMelo's employment with Defendants is ongoing.

16.     Plaintiff Julia Edging was employed by Defendants as Activities Director and/or the Residential Care Facility for the Elderly ("RCFE") Supervisor from June 2009 until she was terminated in or about February 2014.

17.     Defendant Premier B.H. Inc. is an Illinois corporation with its principal place of business at 1141 S. Beverly Dr., 3rd Floor, Los Angeles, CA, 90035.  Premier B.H. Inc.'s registered agent is Defendant Jacob Graff in Los Angeles, CA.

18.     Defendant Jacob Health Care Center, LP is a California limited partnership with its principal place of business at 4075 54th Street, San Diego, CA 92105.  In 1996, Jacob Health Care Center, LP was licensed by the Department of Public Health, Licensing and Certification Division of the State of California ("CDPH") to operate Jacob Health Care Center, LP as a skilled nursing facility.

19.     Defendant M.O. Jacob Health Care Center, LP is a California limited partnership with its principal place of business at 4075 54th Street, San Diego, CA 92105.

20.     Defendant Community Convalescent Hospital of La Mesa, LP dba Community Care Center of La Mesa is a California limited partnership with its principal place of business at 8665 La Mesa Blvd., La Mesa, CA 91941.  In 2009,

1   Community Convalescent Hospital of La Mesa, LP was licensed by CDPH to operate

2   Community Convalescent Hospital of La Mesa, LP as a skilled nursing facility.

3      21.    Defendant M.O. Community Convalescent Hospital of La Mesa, LP is a

4   California limited partnership with its principal place of business at 8665 La Mesa

5   Blvd., La Mesa, CA 91941.

6      22.    Defendant Eldorado Care Center, LP is a California limited partnership

7   with its principal place of business at 510 E. Washington Ave., El Cajon, CA 92020.

8   In 2005, Eldorado Care Center, LP was licensed by CDPH to operate Eldorado Care

9   Center, LP as a skilled nursing facility.

10     23.    Defendant Paramount Meadows Nursing, LP is a California limited

11  partnership with its principal place of business at 7039 Alondra Blvd., Paramount,

12  CA 90723. In 2013, Paramount Meadows Nursing Center, LP was licensed by CDPH

13  to operate Paramount Meadows Nursing Center as a skilled nursing facility.

14     24.    Defendant Norwalk Meadows Nursing Center, LP is a California limited

15  partnership with its principal place of business at 10625 Leffingwell Rd., Norwalk,

16  CA 90650. In 2013, Norwalk Meadows Nursing Center, LP was licensed by CDPH

17  to operate Norwalk Nursing Meadows Center by CDPH to operate Norwalk

18  Meadows Nursing Center as a skilled nursing center.

19     25.    Defendant Pasadena Meadows Nursing Center, LP is a California

20  limited partnership with a business address of 1141 Beverly Drive, 3rd Floor, Los

21  Angeles, CA 90035. In 2013, Pasadena Meadows Nursing Center, LP was licensed

22  by CDPH to operate Pasadena Meadows Nursing Center as a skilled nursing facility.

23     26.    Defendant Panorama Meadows Nursing Center, LP is a California

24  limited partnership with its principal place of business at 14857 Roscoe Blvd.,

25  Panorama City, CA 91402. In 2012, Panorama Meadows Nursing Center, LP was

26  licensed by CDPH to operate Panorama Nursing Center as a skilled nursing center.

27     27.    Defendant Meadows Management, Inc. is a California corporation with

28  its principal place of business at 1141 S. Beverly Drive, 3rd Floor, Los Angeles, CA

COMPLAINT

90035.

28.    Jacob Health Care Advisors, LLC is a California limited liability corporation with its principal place of business at 1141 S. Beverly Drive, 3rd Floor, Los Angeles, CA 90035.

29.    Defendant Jacob Graff, a resident of California, is an owner and the President of Premier B.H. Inc.  At all relevant times, Graff was responsible for management of the day-to-day operations of The Premier SNFs and for the recruitment policies and failure of care alleged herein.

30.    Defendant Pnina Graff, a resident of California, is an owner and the secretary of Premier B.H. Inc.  At all relevant times, Pnina Graff was responsible for management of the day-to-day operations of the Premier SNFs and for the recruitment policies and failure of care alleged herein.

31.    On information and belief, the above-named Defendants in paragraphs 17 through 30 above all had some direct or indirect ownership interest in one or more of the Premier SNFs and were responsible for their management and operations in some form.

**FACTUAL BACKGROUND**
**THE MEDICARE AND MEDI-CAL PROGRAMS**

32.    Medicare is a federally-funded health insurance program for persons 65 years and older and for certain disabled persons. 42 U.S.C.A. §1395 (Title XVIII of the Social Security Act). The Center for Medicare and Medicaid Services (CMS) is responsible for administration of the Medicare program. Currently, Medicare provides insurance coverage to approximately 40 million Americans.

33.    The Medicaid Program was enacted as part of Title XIX of the Social Security Act.  Medicaid is a joint federal-state program that is administered separately in each of the 50 states and pays healthcare services provided to qualified low-income persons, including aged, blind, or disabled individuals. 42 U.S.C. §§ 1396-1396v.

34. In California, the Medicaid Program is called "Medi-Cal" and is administered by the California Department of Health Care Services ("DHCS") and CDPH. The CMS Medicare regulations at 42 C.F.R. § 409 *et seq.* apply to beneficiaries of both Medicare and Medi-Cal (beneficiaries of both programs are referred to as "dual eligibles".)

35. California's Medi-Cal program ("Medi-Cal") is a crucial safety net for Californians who are unable to afford health care. Intended to provide essential care for California's growing indigent population, Medi-Cal funds are stretched to their limit. Too many times, Medi-Cal has been subject to fraud and abuse by unscrupulous providers who have put profits above the public good. Funds that have been designated for essential services to the neediest among Californians have been diverted away because of false billing schemes. Those fraudulent schemes have threatened to diminish the quality of care, unnecessarily burdened taxpayers, and degraded the medical profession. This case is being brought to stop the rampant Medi-Cal fraud being perpetrated against California by the Defendants' nursing home chain, which it has been doing at least since 2007.

36. CMS reimburses nursing home providers for the "reasonable costs" of covered services furnished to Medicare and Medicaid beneficiaries. *See* 42 U.S.C. §§ 1395x(v)(1)(A), 1395f(b); 42 C.F.R. §§ 413.9(a)-(b). As a condition of participation in the Medicare and Medi-Cal programs, providers are required to enter into "Provider Agreements" with the government. 42 U.S.C. § 1395cc.

37. Both the Medicare and Medi-Cal programs pay for nursing home care for their beneficiaries. Facilities that wish to provide services to these beneficiaries must meet and maintain the minimum staffing, quality of life and other requirements set forth in the Social Security Act as well as all applicable state requirements and standards. Maintaining the state and federal requirements and standards are also prerequisites to receiving payments under the Medicare and Medi-Cal programs.

/ / /

COMPLAINT

38.    On information and belief, all the Premier SNFs as "Providers" executed a Medi-Cal Telecommunications Provider and Biller Application/Agreement (Form 6153) with the DHCS. Form 6153 required the provider to certify under penalty of perjury that (1) "all claims for services submitted electronically have been personally provided to the patient"; (2) "[t]he services were medically indicated and necessary to the health of the patient"; and (3) "all information submitted electronically is accurate and complete."  By signing Form 6153, the Provider (1) "understands that payment of [Medi-Cal] claims will be from federal and/or state funds, and that any falsification or concealment of a material fact may be prosecuted under federal and/or state laws"; (2) "agrees to retain personal responsibility for the development, transcription, data entry, and transmittal of all claim information for payment"; and (3) "assume[s] personal responsibility for verification of submitted claims with source documents."

39.    The Medi-Cal Provider Agreement (Form DHCS 9098 (6/10)), similarly required the provider to agree to "comply with all federal laws governing and regulating Medicaid providers," and that "it may be subject to temporary suspension" if it is under investigation for fraud or abuse of the Medi-Cal program "or other health care programs operated, or financed in whole or in part, by the Federal Government."

40.    At all times relevant herein, the Medicare Provider Agreement, Form CMS-1561 (07/01), contained the following certification: "In order to receive payment under title XVIII of the Social Security Act, [provider name] as the provider of services, agrees to conform with the provisions of the 1866 Social Security Act and applicable provisions in 42 CFR." The provider must also certify that it can be subject to criminal penalties if it "knowingly and willfully falsifies" a material fact, or makes any "false, fictitious or fraudulent statement or representation."

41.    As a final condition of participation and payment in the Medicare program, Medicare providers must execute a Medicare Electronic Data Interchange

("EDI") Enrollment Form in order to submit claims electronically. The EDI Form requires providers to agree to "be responsible for all Medicare claims submitted to CMS by itself, its employees, or its agents," and to "submit claims that are accurate, complete and truthful."  By executing the EDI Enrollment Form, a provider acknowledges that "all claims will be paid from Federal funds, that the submission of such claims is a claim for payment under the Medicare program, and that anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim as required by this Agreement may, upon conviction be subject to a fine and/or imprisonment under applicable Federal law."

### A.    Nursing Facility Services Under Medicare And Medicaid

42.    Medicare Part A and Medicaid authorize payment for institutional care, including care in facilities licensed by the states. 42 U.S.C. 42 U.S.C. §§ 1395c-1395i-5.

43.    Subject to certain conditions, Medicare Part A covers up to 100 days lifetime of skilled nursing and rehabilitation care for a benefit period (i.e., spell of illness) following a qualifying hospital stay of at least three consecutive days. 42 U.S.C. § 1395d(a)(2)(A); 42 C.F.R. §409.61(b), (c).

44.    The conditions that Medicare imposes on its Part A skilled nursing facility ("SNF") benefit include: (1) that the patient requires skilled nursing care or skilled rehabilitation services (or both) on a daily basis, (2) that the daily skilled services must be services that, as a practical matter, can only be provided in a skilled nursing facility on an inpatient basis, and (3) that the services are provided to address a condition for which the patient received treatment during a qualifying hospital stay or that arose while the patient was receiving care in a skilled nursing facility (for a condition treated during the hospital stay). 42 U.S.C. § 1395f(a)(2)(B); 42 C.F.R. § 409.31(b).

45.    Medicare requires that a physician or certain other practitioners certify that these conditions are met at the time of a patient's admission to the nursing facility

and to re-certify to the patient's continued need for skilled rehabilitation therapy services at regular intervals thereafter. See 42 U.S.C. § 1395f(a)(2)(B); Medicare General Information, Eligibility, and Entitlement Manual, Ch. 4, § 40.3.

46.    To be considered a skilled service, it must be "so inherently complex that it can be safely and effectively performed only by, or under the supervision of, professional or technical personnel," 42 C.F.R. § 409.32(a), such as physical therapists, occupational therapists, or speech pathologists. See 42 C.F.R. § 409.31(a).

47.    Skilled rehabilitation therapy generally does not include personal care services, such as the general supervision of exercises that have already been taught to a patient or the performance of repetitious exercises (e.g., exercises to improve gait, maintain strength or endurance, or assistive walking). See 42 C.F.R. § 409.33(d). "Many skilled nursing facility inpatients do not require skilled physical therapy services but do require services, which are routine in nature. Those services can be performed by supportive personnel; e.g., aides or nursing personnel . . . ." Medicare Benefit Policy Manual, Chapter 8, § 30.4.1.1.

48.    Medicare Part A will only cover those services that are reasonable and necessary.  See 42 U.S.C. § 1395y(a)(1)(A); see also 42 U.S.C. § 1320c-5(a)(1) (providers must assure that they provide services economically and only when, and to the extent, medically necessary); 42 U.S.C. § 1320c-5(a)(2) (services provided must be of a quality which meets professionally recognized standards of health care).

49.    In the context of skilled rehabilitation therapy, this means that the services furnished must be consistent with the nature and severity of the patient's individual illness, injury, or particular medical needs; must be consistent with accepted standards of medical practice; and must be reasonable in terms of duration and quantity.  *See* Medicare Benefit Policy Manual, Ch. 8, § 30.

50.    In order to assess the reasonableness and necessity of those services and whether reimbursement is appropriate, Medicare requires proper and complete documentation of the services rendered to beneficiaries. In particular, the Medicare

statute provides that: "No payment shall be made to any provider of services or other person under this part unless there has been furnished such information as may be necessary in order to determine the amounts due such provider or other person under this part for the period with respect to which the amounts are being paid or for any prior period." 42 U.S.C. § 1395l(e). 31 U.S.C. § 3729(a)(1)-(2) (2006), as amended by 31 U.S.C. § 3729(a)(1)(A)-(B) (West 2010).

51.    The Nursing Home Reform Act ("NHRA") of 1987, 42 U.S.C. § 1395i-3, 1396r et seq., defines a nursing home (a "skilled nursing facility" under Medicare and "nursing facility" under Medicaid, jointly referred to as "facilities") as an institution that is primarily engaged in providing skilled nursing and rehabilitation services above the level of room and board to Medicare and Medicaid beneficiaries who require such services on an inpatient basis, and that is not primarily for the care and treatment of mental diseases. 42 U.S.C. § 1396r(a).

52.    Among other requirements, the NHRA mandates that facilities participating in Medicare or Medicaid operate in compliance with all federal and state standards applicable to the provision of skilled nursing services. 42 U.S.C. §§ 1395i-3(b)(4)(A), 1395r(b)(4)(A); 42 U.S.C. §§ 1396r(b), 1396r(d)(4)(A).  Facilities must ensure that all services billed to the government are "of a quality which meets professionally recognized standards of health care," and which "attain or maintain the highest practicable physical, mental and psychosocial well-being of each resident in accordance with a plan of care which . . . describes the medical, nursing, and psychosocial needs of the resident and how such needs will be met." 42 U.S.C. §§ 1320c-5(a)(2), 1395i-3(b)(2); 42 U.S.C. §§ 1396r(b)(2), 1396r(d)(4)(A); 42 C.F.R. §§ 483.15, 483.25.

53.    The CMS regulations implementing the NHRA impose numerous quality care requirements, including 24-hour nursing staff which is sufficient to meet the nursing needs of the residents, maintenance of complete and accurate clinical records, avoidance of medication errors, acceptable nutrition, proper treatment of

pressure sores and urinary incontinence, and provision of adequate supervision and assistance devices to prevent accidents. 42 C.F.R. §§ 483.30, 483.13(a), 483.25, 483.60, 483.75.

54.     In particular, the regulations require that nursing home residents be free of unnecessary drugs. An unnecessary drug is any drug when used in excessive dose, for excessive duration, without adequate monitoring, or adequate indications for its use, and/or in the presence of adverse consequences.

55.     The regulations also require the residents to be free from any physical or chemical restraints used for convenience or discipline.  Moreover, drug regimens must be free from medication errors. 42 C.F.R. §§ 483.25(l)-(m).

56.     Furthermore, a nursing facility must ensure that residents "who have not used antipsychotic drugs are not given these drugs unless antipsychotic drug therapy is necessary to treat a specific condition as diagnosed and documented in the clinical records; and residents who use antipsychotic drugs receive gradual dose reductions, and behavioral interventions, unless clinically contraindicated, in an effort to discontinue these drugs." 42 C.F.R. § 483.25(l)(2).

57.     The result of Defendants' persistent failures to meet any of the above standards or to otherwise provide services that are "of a quality which meets professionally recognized standards of care" is that Defendants failed to satisfy Medicare and Medi-Cal's criteria for payment.  Defendants thus submitted false claims in connection with their provision of substandard and/or worthless care, as detailed herein.  The claims for payment submitted by Defendants were also false in that they were premised on false and forged records Defendants created to conceal their substandard and worthless services and that are relied upon by Medicare and Medi-Cal as a basis for payment under these programs.

58.     Compliance with the foregoing laws and regulations is a condition of participation in the Medicare and Medi-Cal programs. 42 C.F.R. § 483.1(b); CMS

State Operations Manual Chapter 7, Survey and Enforcement Process for Skilled Nursing Facilities and Nursing Facilities, § 7300.

### B.    The Medicare and Medi-Cal Payment Systems

59.    Under Medicare, nursing homes are paid on a per diem basis under a prospective payment system for a "bundle of services" provided to a resident.  Under this system, skilled nursing facilities receive periodic per diem payments that cover all costs of furnishing covered services (routine, ancillary, and capital-related costs), other than costs associated with approved educational activities and bad debts and costs associated with a certain limited number of items and services described in the statute. 42 U.S.C. § 1395yy(e)(1)-(2).  The payments are made "not less often than monthly," prior to audit, and prior to furnishing services to beneficiaries. 42 U.S.C. § 1395g. CMS relies on the providers' assessments of the residents' condition and needs, as explained below, in order to calculate the prospective payments due.

60.    CMS administers the prospective payment system through contracts with "fiscal intermediaries" or "Medicare administrative contractors" (collectively, "Medicare Contractors"). 42 U.S.C. § 1395h; 71 Fed. Reg. 67960, 68181 (Nov. 24, 2007).  Medicare Contractors act on behalf of CMS. 42 C.F.R. § 421.5(b).

61.    Medicare Contractors calculate the per resident per diem rate based in principal part on what the nursing facility reports on the "Minimum Data Set" ("MDS") form for the resident. 42 C.F.R. §§ 483.343, 483.20, 483.315(h)(1)(v); 483.15. The MDS is a resident assessment tool, and must be completed for each resident upon admission to the facility and then periodically thereafter, and transmitted to the Medicare Contractors. The MDS must accurately state each resident's functional capabilities, medical condition and mental status.

62.    At all times relevant herein, the MDS contained the following certification: "I understand that this information is used as basis for ensuring that residents receive appropriate and quality care, and as a basis for payments from Federal funds. I further understand that payment of such Federal funds and continued

participation in the government-funded health care programs is conditioned on the accuracy and truthfulness of this information, and that I may be personally subject to or made subject my organization to substantial criminal, civil, and/or administrative penalties for submitting false information. I also certify that I am authorized to submit this information by this facility on its behalf."

63.    Like Medicare, Medi-Cal also reimburses facilities on a per diem basis using "a facility specific rate setting system . . . that reflects the cost and staffing levels associated with quality of care for residents in facilities" *Welf. & Inst. Code* §14126.02(b). Facilities submit claims for payment using Form LTC 25-1.

64.    In addition to the MDS Form used to calculate prospective per diem rates, facilities are required to submit annual cost reports to CMS, where they report actual costs incurred during the year for services provided to beneficiaries. At all relevant times herein, a responsible official of each subject facility was required to certify in the Medicare cost reports: "to the best of my knowledge and belief, this report and statement are true, correct, complete . . . I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations." The certification also acknowledges that "misrepresentation or falsification of any information contained in the cost report may be punishable by criminal, civil or administrative action, fine and/or imprisonment under federal law."

65.    Similarly, facilities are required to submit annual cost reports to Medi-Cal. At all relevant times herein, a responsible official of the facilities was required to and did certify in the Medi-Cal cost reports "that to the best of his or her knowledge and information he or she believes each statement and amount in the submitted reports to be true and in compliance with Section 14161 of the California Welfare and Institutions Code and/or Section 51511.2 of Title 22 of the California Code of Regulations Section 51511.2 Title 22, California Administrative Code."

/ / /

66.    At the end of each fiscal or "reporting year" after submission of the cost report, Medicare and Medi-Cal conduct an audit of the facilities cost report. 42 C.F.R. § 405.1803(a); 22 Cal. Code of Regs. § 52516(a).

**C.    Medicare Payment for Skilled Nursing Facility Rehabilitation Therapy**

67.    Under its Prospective Payment System ("PPS"), Medicare pays a nursing facility a pre-determined daily rate for each day of skilled nursing and rehabilitation services it provides to a patient. See 63 Fed. Reg. 26,252, 26,259-60 (May 12, 1998).

68.    The daily PPS rate that Medicare pays a nursing facility depends, in part, on the Resource Utilization Group (RUG) score to which a patient is assigned. Each distinct RUG score is intended to reflect the anticipated costs associated with providing nursing and rehabilitation services to beneficiaries with similar characteristics or resource needs. From January 1, 2006, to October 1, 2010, there were 53 RUGs in the so-called "RUG-III" classification system. See 70 Fed. Reg. 45,026, 45,031 (Aug. 4, 2005).

69.    There are generally five rehabilitation RUG levels for those beneficiaries that require rehabilitation therapy: Rehab Ultra High (known as "RU"), Rehab Very High ("RV"), Rehab High ("RH"), Rehab Medium ("RM"), and Rehab Low ("RL").

70.    The rehabilitation RUG level to which a patient is assigned depends upon the number of skilled therapy minutes a patient received and the number of therapy disciplines the patient received during a seven-day assessment period (known as the "look back period").

71.    Medicare pays the most for those beneficiaries that fall into the Ultra High RUG level. The Ultra High ("RU") RUG level is "intended to apply only to the most complex cases requiring rehabilitative therapy well above the average amount of service time." 63 Fed. Reg. 26,252, 26,258 (May 12, 1998).

72.    In addition to reflecting a patient's rehabilitation therapy needs, each RUG also reflects the patient's ability to perform certain activities of daily living

1   ("ADL"), like eating, toileting, bed mobility and transfers (e.g., from a bed to a

2   chair). A patient's ADL score (ranging from A to C) reflects his or her dependency

3   level when performing an ADL. A very dependent patient, who cannot perform any

4   of the ADLs without assistance, would generally receive an ADL score of "C," while

5   a patient who could perform the ADLs without assistance would receive an ADL

6   score of "A."

7        73.    In addition to the ADL scores of A, B, and C, Medicare provides "X"

8   and "L" ADL scores for those beneficiaries that require "extensive services" in

9   addition to rehabilitation therapy. Extensive services include intravenous treatment,

10  ventilator or tracheostomy care, or ostomy suctioning. A very dependent

11  rehabilitation patient who requires more extensive services would generally receive

12  an ADL score of "X," while a patient who needs only one of the extensive services

13  might receive an ADL score of "L."

14       74.    CMS has made certain modifications to the RUG-III structure through

15  its RUG-IV classification system, which became effective October 1, 2010. CMS

16  added new clinical RUG categories, modified the timeframe in which each

17  assessment must be performed, required that nursing facilities assess changes in the

18  level of therapy every seven days, and revised certain rules pertaining to group

19  therapy, among other changes. 74 Fed. Reg. 40,288 (Aug. 11, 2009).

20       75.    After October 1, 2010, there were 66 RUGs in the "RUG-IV"

21  classification system. See 74 Fed. Reg. 22,208. Residents are classified into one of

22  eight major categories which indicate the primary patient nursing and/or therapy

23  needs. In hierarchical order, from highest to lowest, the categories are Rehabilitation

24  Plus Extensive Services; Ultra High Rehabilitation; Very High Rehabilitation; High

25  Rehabilitation; Medium Rehabilitation; Low Rehabilitation; Extensive Services;

26  Special Care High; Special Care Low; and, Clinically Complex. 74 Fed. Reg.

27  40,288. Additionally, the look-back period was modified for certain types of care to

28  only include services performed in the look-back period while the patient was a

resident of the SNF.  74 Fed. Reg. 40,288.

## DEFENDANTS WRONGFULLY RECRUITED, ADMITTED AND RETAINED MEDICARE/MEDI-CAL RESIDENTS FOR THEIR OWN PECUNIARY GAIN

76.    The reimbursement received by skilled nursing facilities, including the Premier SNFs varies widely based upon who is paying them.  In 2012, the reported average cost per patient day for a skilled nursing facility was approximately $226.  In California, Medi-Cal reimburses skilled nursing facilities an average of $177 per patient day.  Medicare pays between $165.36 and $617.07 per day for the lowest and highest RUG scores, respectively.  Thus, the most profitable residents a skilled nursing facility can care for are those whose care will be paid by Medicare or by Medicare and Medi-Cal together.

77.    Defendants engaged in a series of practices which fraudulently increased the number of Medicare and Medi-Cal residents in the Premier SNFs and the time such residents spent in their facilities.  Thus, fraudulently charging Medicare and/or Medi/Cal for patients who did not belong in a skilled nursing facility, for services not needed by such residents and for substandard services.

78.    Some of the methods by which Defendants defrauded Medicare and Medi-Cal for their own pecuniary gain are detailed below.

      **A.    Defendants Recruited People to Reside In Their Skilled Nursing Facilities Who Were Not Appropriate For and Did Not Medically Require Residence in a Skilled Nursing Facility.**

      **(1)    Defendants Routinely Recruited Homeless People to Come to The Premier SNFs.**

88.    Throughout the relevant time period and continuing until the present, Defendants literally sent marketing and related personnel out onto the streets of San Diego County and elsewhere to locate homeless people who did not need professional 24-hour-a-day skilled nursing care to come to their facility because they

1    were desperate for somewhere clean and safe to stay.

2        89.    Defendants would go out and find such homeless persons and verify that

3    they could be Medicare eligible.  Defendants would have them admitted to an acute

4    care hospital under a vague diagnosis, such as "failure to thrive" for three days in

5    order to satisfy Medicare's "spell of illness" requirement in order for the Medicare

6    "100 days" to commence.  Then Defendants would have the acute care hospital

7    discharge the homeless persons into the care of one of the Premier SNFs, despite the

8    fact that they had no need for 24-hour a day skilled nursing care.  Defendants would

9    recruit them to come to one of the Premier SNF's with promises of a safe place to

10   stay, getting regular meals and showers and the freedom to come and go as they

11   pleased.

12       90.    A typical example of such a recruit was J.M.[1]  In J.M.'s case,

13   Defendants recruited him off the streets to come and reside at their facility and then

14   billed Medicare for physical therapy and occupational therapy despite the fact that he

15   did not need either as evidenced by Defendants giving J.M. daily passes to leave the

16   facility on his own.  Thus, J.M. was fully capable of functioning without therapy and

17   neither needed nor received the therapies Defendants claimed they provided and for

18   which they billed Medicare.

19       91.    Another resident, Mr. M., was living on the streets when Premier SNFs

20   recruited him to come to their facility to have surgery on his bad knee.  Premier SNFs

21   convinced Mr. M. that he could have his knee surgically corrected and rehabilitate at

22   JHC.  However, Mr. M. never had the surgery and once Defendants had exhausted

23   his Medicare eligibility, they promptly discharged him to live on the streets of San

24   Diego again.

25       92.    Another patient, B.T., was found living in a car and came to live at JHC

26   even though he did not require skilled nursing.

27   / / /

28

(2)    **Defendants Improperly Recruited Psychiatric Patients.**

93.    Licensed California skilled nursing facilities, including the Premier SNFs, cannot provide psychiatric care.  Throughout the relevant time period and continuing until the present, Defendants would nonetheless actively recruit "psych patients" with Medicare eligibility to come to their facilities.  These patients were not appropriate for the Premier SNFs and the Premier SNFs could not provide the appropriate psychiatric care for such patients.  However, Defendants would fraudulently create untrue reasons for keeping such residents in their facilities and bill Medicare and Medi-Cal throughout their stays.  Defendants would hold these residents until their Medicare eligibility ran out and then discharge these residents.

B.    **Defendants Defrauded Medicare by Maximizing The Length of Resident Stays**

1.    **Defendants Pressured Medicare Residents From Their Wishes To Go Onto Hospice And Die At Home, but to Stay and Continue to Receive Skilled Care**

94.    Defendants pressured and lied to dying residents who wanted to go home and die in peace and comfort under hospice care.  Medicare does not pay Defendants if a resident wants to go home and be on hospice.  Residents typically want this when they are at the end of their lives and would rather be in the comfort of their own homes rather than a nursing facility.

95.    There are many examples of residents at the Premier SNFs who wanted to go home and die in the comfort of their own homes.  Despite these desires, Defendants routinely pressured residents such as W.L. and W.H. not to follow their wishes and go home and receive hospice care.   Defendants did this so that they could keep them as residents of their facilities and continue to bill Medicare and/or Medi-Cal.  Defendants also promised that they had comfort care procedures which were just as good as hospice but Defendants knew that promise was false and that their

---

[1] Resident names are abbreviated to protect patient privacy.

COMPLAINT

true intentions were only to keep these residents in their facilities so that they could continue billing Medicare and/or Medi-Cal.

### 2. Defendants Bribed Residents to Stay Longer at The Premier SNFs so Medicare and Medi-Cal Could be Billed For More

96.    Defendants promised and provided Premier SNF residents with all kinds of bribes including frequent shopping trips, private rooms from which they could come and go as they pleased, allowing family to stay with them, allowing pets to stay with them, making their co-pays for them, and even flirtatious contacts from female care providers and others to vulnerable and lonely male residents.

97.    As a result of such conduct, Medicare-eligible residents were coaxed into staying at Premier SNFs significantly longer then actually required for their health needs.  In turn, Premier SNFs were able to improperly reap tens of thousands of dollars in additional Medicare and/or Medi-Cal payments.

98.    In the case of B.H., Defendants actually paid her $500 to reside at their facility and go shopping with the money.   They promised and provided her with her favorite unlimited grape sugar free diabetic popsicles.  In B.H.'s case, she too was also supposed to have a knee surgery but, like Mr. M. above, it too never happened.

99.    C.O. was a male in his 30's who had severe Multiple Sclerosis and was painfully shy around women.   He was in a wheelchair and Defendants bribed him to come and to stay longer in their facility by having his female care providers tell C.O. that they had "crushes" on him when in fact they did not and they were only telling him this so he would stay longer at their facility and the Defendants could bill Medicare for keeping him there.

100.   R.T. was bribed by Defendants to stay in their facility by a promise that his mother could also live there with him.   When his Medicare eligibility ran out, R.T. and his mother had become so comfortable that defendants had to pay him $300 to leave!   Similarly, in the case of P.M., she was bribed to stay at the facility via Defendants' promise that her dog could also live there with her.

101.   S.K. was bribed to come and reside at the facility with the promise that Defendants would make certain that she had transportation to and from her probation officer meetings.   Because S.K. had no other transportation and because she did not want to miss a meeting and violate her probation and go back to jail, she agreed to reside at a Premier SNF in return for Defendants' promise to get her to and from her probation officer meetings.

102.   Additionally, N.B. was promised that if he went from the assisted living side to the skilled nursing side at JHC, he would be able to return to the assisted living side under the Supplemental Security Income rate, not the semi-private rate he was paying.  This despite the fact that N.B. has no medical need for SNF services.

**C.    Defendants Churned Patients using Medicare and Medi-Cal to Maximize Profits**

103.   Defendants used Medi-Cal to supplement Medicare by "churning" patients.  "Churning" involves Defendants using up all of a patients' Medicare therapy days, etc.  Defendants then keep the patient in-house by being paid by Medi-Cal for their stay and by Medicare Part B for therapy.  Once a patient's Medicare days have regenerated after the waiting period, Defendants then send the patient back to the hospital for a 3-day stay for a spurious reason in order for the patient to be eligible again for Medicare.  Defendants repeat this process in order to perpetually be paid by Medicare and Medi-Cal for a patient's care.  Thus, Defendants continuously bill Medicare and Medi-Cal for the care and treatment of patients who do not require said care and treatment.

**D.    Defendants Defrauded Medicare By Falsely Increasing Its RUG Scores and By Billing For Services Not Provided.**

104.   Defendants used multiple ways to defraud Medicare by falsely increasing the RUG Scores at Premier SNFs so they could collect higher reimbursements from the Medicare program.   Some common ways Defendants did this was by charting that a resident required oxygen and having "orders" that the

resident's bed be placed at an upright angle which would increase RUG scores and reimbursement rates.  Defendants did this most often with residents who had chronic obstructive pulmonary disease ("COPD"), whom Defendants viewed as high priority residents since they could maximize each of their RUG scores.

105.   Defendants even went so far as to teach CNAs at Premier SNFs how to chart "correctly" to increase Medicare reimbursement.   For example, Defendants would bill Medicare for rehabilitation services when the patient was brain dead and could not participate or benefit in rehabilitation and bill Medicare for such services where the patient had a skin tear on his/her leg and the "rehab" was nothing more than putting a bandage on the skin tear.

106.   By way of example, S.J. was a heroin addict in her 30's.   Defendants recruited her to come to their facility and then billed Medicare for physical therapy and occupational therapy despite the fact that S.J. was only in her 30's and could get around fine on her own as evidenced by the daily passes Defendants gave her which allowed her to go out of the facility on her own and without supervision.

107.   In the case of C.M., he was a resident with brain cancer which at one time had caused him a wound on his head.   Defendants continued to bill Medicare for wound treatment long after the wound had healed.

108.   In other cases, Defendants targeted persons with AIDS to come live at their facilities because AIDS patients would garner them Medicare reimbursement rates that were almost double, regardless of the fact that such patients were wholly inappropriate for SNF care.

## DEFENDANTS PROVIDED WORTHLESS AND/OR SUBSTANTIALLY DIMINISHED SERVICES TO THE RESIDENTS OF PREMIER SNF's

109.   From at least 2007 and continuing up to the present, the services Defendants provided to residents of Premiere SNFs were also so deficient, inadequate, and substandard as to constitute worthless or substantially diminished services in violation of state and federal statutes, regulations, and contractual

provisions with a nexus to payment.

110. Defendants knew, should have known or acted in reckless disregard that residents of Premier SNFs were subjected to unreasonable risks of physical and mental harm by virtue of their neglect and diminished or substandard services.  At all times relevant to this action, Defendants failed to:

(a)    Ensure residents received their medications as prescribed by their physicians;

(b)    Ensure residents received adequate nutrition and assistance with meals;

(c)    Treat and prevent contagious and painful skin infections and disorders including infestation with scabies;

(d)    Prevent the spread and outbreak of contagious and painful skin disorders including scabies;

(e)    Prevent painful bedsores;

(f)    Provide for and assist residents with their personal hygiene including clean and dry beds, clothes and regular baths; and

(g)    Otherwise provide for the basic needs, safety and well-being of the

residents, including preventing resident falls.

111. At all times relevant to this action, Defendants fraudulently concealed the worthless or substantially diminished services they provided to Premier SNFs' residents from Government agencies and inspectors who visited Premier SNFs from time to time.

112. Furthermore, many of the patients had significant weight loss and did not receive adequate nutrition, including patients J.S. and D.T.  The caregivers would place nutritional supplements next to the patients on their bedsides but they would not assist the patients in taking the supplements, thus leaving the supplements unopened on a daily basis.

COMPLAINT

113.   Another specific instance is the substandard care provided to patients with gastric tubes and pumps.  JHC caregivers were required to ensure that these patients received adequate nutrition.  However, the vast majority of these patients had serious weight loss because staff would turn off the pumps and not turn them back on.  The majority of these patients did not receive complete feedings and were largely malnourished.

114.   Defendants also did not prevent and treat patients for painful, contagious skin diseases such as scabies.  For example, JHC did not report its outbreak of scabies, many patients were left untreated, and JHC did not implement any infection control procedures.  The following patients suffered from painful skin conditions: R.B., R.C., J.S., C.H., C.W., patient D., L.A., S.N., and R.J.  JHC management instructed its caregiver nurses not to score resident falls or pressure ulcers as required for all nursing homes because the management did not want their five-star rating to be affected.

115.   Additionally, JHC had no infection control procedure that they followed to prevent the spread of infections, so many patients spread infections to one another.  JHC also failed to turn patients so many patients developed painful bedsores.

## DEFENDANTS' SWORN DISCLOSURE STATEMENTS SUPPORT THE ALLEGED WRONGDOING

### A.   The Excessive Number of Medicare Patients and Revenue of Premier SNFs Evidence Their Improper Recruiting, Retaining and Billing of Medicare Eligible Individuals

116.   Nursing homes, including SNFs, are required to submit annual disclosure statements under the penalty of perjury to California's Office of Statewide Health Planning and Development.  In these disclosure statements, SNFs report, among things, their gross services, their Medicare Patient Days, their Medicare gross routine services, management fees paid, and Administrator salaries.  On information and belief, Defendants' disclosure reports from 2009 through 2012 plainly reveal that

the Premier SNFs have very large Medicare statistics compared to that of other California nursing homes.

117.   For example, in California, approximately 15% of a typical SNF's residents are Medicare patients. The balance of their patients are typically covered under Medi-Cal, private pay, or other types of long-term care insurance.  On information and belief, however, the Medicare Gross routine services (those health services covered under Medicare Part A) of the Premier SNF's have averaged between 35% and 45% of their total gross annual income – well above the California average.

118.   With regard to Medicare Ancillary Services (including physical therapy, occupational therapy, rehabilitation, etc.), nursing facilities in California generally receive somewhere between $1,000,000 and $2,000,000 annually.  Here, however, data submitted by Defendants shows the Premier SNFs range from $3,000,000 to over $6,000,000 annually in Medicare Ancillary Services – at least three times the state average.  This disparity is no surprise in light of the Premier SNFs' consistent reporting of unnecessary and/or non-existent rehabilitation services, as alleged herein.

**B.    Excessive Payments to Premier SNF Administrators Further Demonstrate Defendants' Improper Medicare Billing Practices**

119.   On information and belief, in California, SNF administrators have a median salary of $96,931 per year.  However, the Premier SNFs' administrators' average ranges from $200,000 per year to more than $350,000 per year.  In addition, SNF administrators in California generally work full time at one nursing home, however, the Premier SNFs' administrators are reported to have worked at multiple facilities each year, taking a sizeable income from each facility.  This type of situation and payments are highly unusual in this course of work.  The following describes the data submitted by Defendants on some of their past and present SNF administrators:

/ / /

- <u>Jo Ellen Zayer</u>:  Based upon Premier SNFs' State disclosures, in the years 2008 and 2009, Ms. Zayer was remarkably listed as an administrator at Jacob Health, Community Care Center, and Eldorado Care Center *as a full time employee for each facility*.  For instance in 2008, Ms. Zayer's reported income from Jacob Health was $273,000; $212,000 from Community Care Center; and $230,000 from Eldorado, making her combined income $715,000 for that year.  This is more than seven times the amount of income that an average California Nursing Home Administrator makes.  In 2009, Ms. Zayer was reported to have worked at Jacob Health, Community Care Center, and Eldorado Care Center.  From those facilities, she reportedly made $245,000; $246,000; and $383,000, respectively for a total income of $874,000.  In 2010 she was reported to have only worked at Eldorado Care Center where made approximately $274,000. Therefore, from 2008 through 2010, Ms. Zayer made approximately $1,700,000 as an administrator for Premier SNFs. This is approximately more than five times what an administrator would have made in three years of working as an administrator at virtually any other California nursing home.

- <u>Lisa Thomashow</u>:  In 2010, Ms. Thomashow was listed at an administrator at both Jacob Healthcare Center and at Community Care Center.   Further, during the years of 2010 through 2012, Defendants reported that Ms. Thomashow earned a little more than $1,000,000 as an administrator for the Premier SNFs.  This is more than three and half times what the average nursing home administrator would have made during that same time period and did so while, in part, reportedly working at two different SNFs simultaneously.

- <u>Gerilyn Ricacho</u>:  Ms. Ricacho was employed during 2009, 2010, and 2012 at Eldorado Care Center as the administrator.  During that time period she was paid $118,000 and $128,000 during 2009 and 2010, respectively.  Interestingly, however, during 2012, her salary more than doubled and she was paid over $341,000 that year by Eldorado, which is approximately three and half times more than the average annual salary of a nursing home administrator.

- <u>Julie Miller</u>:  During the years of 2008 through 2012, Ms. Miller worked at Norwalk Meadows and Paramount Meadows.  Although, she did not work at either of the facilities concurrently, she did have a very large salary from these facilities.  In 2008, Ms. Miller worked at Norwalk Meadows, and was paid $253,000 that year.  In 2009 through 2012, Ms.

Miller worked at Paramount Meadows and was paid $304,000; $321,000; $322,000; and $347,000 for those respective years. Her total income during that time period was more than $1,500,000 over five years, which is more than three and half times what the average nursing home administrator would have been paid.

• Yehuda Schmukler: During 2009 through 2011, Mr. Schmukler worked at Norwalk Meadows as the administrator. He made $220,000; $303,000; and $314,000, during those years respectively. His total income during that time period was approximately $639,000, which is approximately three times what the average nursing home administrator would have made.

• Overlap of Administrators: Generally, California SNFs have one administrator, who might be assisted by one assistant administrator. Premier SNFs' disclosures, however, show each facility had multiple administrators working for them at the same time. For instance, Ms. Zayer and Ms. Thomashow worked for the same facilities while each being paid sizeable incomes during the same year. In addition Ms. Miller and Mr. Schmukler each worked for the same facility and also made sizeable incomes during the same time period.

120.    On information and belief, the above-described inflated salaries and multiple simultaneous administrators at Premier SNFs are a direct result, in large part, of Defendants' improper Medicare and Medi-Cal billing practices alleged herein. While virtually any California SNF who properly complies with Medicare and Medi-Cal law could not afford these types of salaries, they were/are made possible at Premier SNFs due to their alleged ill-gotten gains.

## DEFENDANTS' UNLAWFUL RETALIATION AGAINST PLAINTIFFS

121.    Plaintiff Lindsey Marino complained of much of the above-referenced wrongdoing continually and on numerous occasions to Premier SNF management, including specifically complaints that several residents were receiving Medicare benefits, even though these patients were wholly inappropriate for SNF services/care. / / /

122.   Plaintiff Marino was terminated because of such complaints and because she complained that she did not want to admit an incoming patient, C.O., because she did not believe he needed any rehabilitation or physical therapy.

123.   Shortly prior to her termination, Ms. Marino had begun to speak up more about Defendants' fraudulent Medicare and/or Medi-Cal practices and refused to carry them out.

124.   As a direct result, and in retaliation for her repeated complaints to management of the violations of federal and state law, Plaintiff Marino was fired the next week and she was told the reason was that it was due to a "complaint from staff."

125.   Similarly, Plaintiff Julia Edging complained of much of the above-referenced wrongdoing continually and on numerous occasions to Premier SNF management, including specifically complaints that several residents were receiving Medicare benefits, even though these patients were wholly inappropriate for SNF services/care.

126.   As a direct result and in retaliation for her repeated complaints to the Administrator and Director of Nurses at JHC, Plaintiff Edging was suddenly terminated on or about February 23, 2014 without previous warning.

127.   Upon her termination, she was told that she was not doing what was expected of her in a timely manner.

## THIS IS NOT THE FIRST TIME JACOB GRAFF HAS BEEN INVOLVED IN MEDICARE WRONGDOING

128.   On or about, October 25, 2004, Defendant Graff was named as a defendant in a False Claims Act action filed in the Eastern Division of the United States District Court of Illinois.  That case was styled *Absher et al. v. Momence Meadows Nursing Center, Inc.*, Case No. 2:04-cv-02289-HAB-DGB and alleged FCA violations against Momence Meadows at its owner, Graff, based on substandard

care and the submission of "thousands of false claims" to Medicare. That matter ultimately resulted in a $9 million judgment against the nursing home. Graff is also the owner of Defendant Premier B.H., Inc. and the conduct alleged here bares significant resemblance to the conduct in which he was involved in Illinois.

## THE TIME PERIOD COVERED BY COMPLAINT

129.   Defendants' failures in care and other wrongful conduct as alleged above occurred since 2007 and, on information and belief continues through the present. Thus, Defendants submitted false claims to Medicare and Medi-Cal from at least 2007 through the present in connection with the care of the residents detailed herein, and also in connection with the care of similar residents at other Premier SNFs.

130.   Plaintiffs' current information and belief confirms that the above-described wrongful recruitment, admission and retention of residents inappropriate for an SNF and Defendants' failure to provide adequate quality of care persists today.

131.   Defendants' forgery and falsification of patient records and staffing logs continues as well. Due to Defendants' false reporting, CMS and CDPH do not know the true state of affairs at the Premier SNFs, or the extent of the forgery and falsification of patient records and staffing logs.

## FIRST CAUSE OF ACTION

### (Against All Defendants)

### False Claims Act

132.   Plaintiffs repeat and reallege each allegation contained in paragraphs 1 through 133 above as if fully set forth herein.

133.   Plaintiffs bring this Qui Tam action on behalf of themselves and the United States Government to recover treble damages and civil penalties under 31 U.S.C . § 3729(a) of the False Claims Act. 75. 31 U.S.C. § 3729(a) provides, in relevant part, liability for any person who-

(a)     knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the

Armed Forces of the United States a false or fraudulent claim for payment or approval;

(b)    knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government.

(c)    Conspires to defraud the Government by getting a false or fraudulent claim allowed or paid.

134.    By virtue of the acts described herein, Defendants violated 31 U.S.C. §3729(a)(1) and (2) from at least 2007 and continuing through the present, and knowingly presented or caused to be presented thousands of false or fraudulent claims to CMS and CDPH for Medicare and Medi-Cal reimbursement.

135.    CMS and CDPH, unaware of the Defendants' violations of §3729(a)(1) and (2) as described herein, paid or contributed to the payment of, the claims submitted by Defendants.

136.    As a result of Defendants' violations of 31 U.S.C.A. § 3729(a)(1) and (2), the United States Government has been damaged in an amount far in excess of millions of dollars, exclusive of interest.

137.    Plaintiffs are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to 31 U.S.C.A § 3730(b) on behalf of themselves and the United States.

**WHEREFORE,** Plaintiff Rachel Cohen, Kim DeMelo, Julia Edging, Lucia Garcia, Lindsey Marino, and Jennifer Palabrica respectfully request this Court award the following damages to the following parties and against Defendants:

To the UNITED STATES:

(a)    Three times the amount of actual damages which the United States Government sustained as a result of Defendants' submission of false claims;

(b)    A civil penalty of not less than $5,500 and not more than $11,000 for

1  each false claim Defendants presented or caused to be presented to the

2  United States for payment;

3  (c)  Prejudgment interest;

4  (d)  All costs incurred in bringing this action.

5  To Plaintiffs Rachel Cohen, Kim DeMelo, Julia Edging, Lucia Garcia, Lindsey

6  Marino, and Jennifer Palabrica:

7  (a)  The maximum amount allowed pursuant to 31 U.S.C.A. §3730(d) and/or

8  any other applicable provision of law;

9  (b)  Reimbursement for reasonable expenses which Plaintiffs incurred in

10  connection with this action;

11  (c)  An award of reasonable attorneys' fees and costs; and

12  (d)  Such further relief as this Court deems equitable and just.

13  ## SECOND CAUSE OF ACTION

14  ### (Against All Defendants)

15  ### California False Claims Act, Presenting False Claims

16  ### California Government Code §12651(a)(1)

17  138.  Plaintiffs incorporate herein by reference the allegations stated in

18  Paragraphs 1 through 137, inclusive, of this Complaint.

19  139.  At all times relevant hereto, each Defendant "knew" or acted

20  "knowingly," as those terms are defined in Cal. Gov. Code section 12650(b)(2), in

21  making, presenting, or submitting false claims.  In that respect, each Defendant acted:

22  a.  With actual knowledge of the information; or

23  b.  In deliberate ignorance of the truth or falsity of the information; or

24  c.  With reckless disregard of the truth or falsity of the information.

25  140.  At all times relevant hereto, each Defendant presented false claims as

26  defined Cal. Gov. Code sections 12650 and 12651, by:

27  d.  Knowingly presenting or causing to be presented to an office or

28  employee of California false claims for payment or approval of claims

32                                                    COMPLAINT

for reimbursement; and/or

    e.  Knowingly making, using, or causing to be made or used false records or statements to get claims paid or approved by California for Medi-Cal reimbursement; and/or

    f.  Being a beneficiary of inadvertent submissions of false claims to California, subsequently discovering the falsity of the claims, and failing to disclose the false claims to California within a reasonable time after discovery of the false claims; and/or;

    g.  Conspired to submit false claims for payment or approval of claims for reimbursement to an office or employee of California.

141. Defendants and each of them, knowingly (as defined in California Government Code section 12650, subdivision (b)(2)) presented or caused to be presented false claims for payment or approval to an officer or employee of California.

142. Each Defendant knowingly made, used , and or caused and used false records of services, in order to obtain payment or approval of charges to the Medi-Cal program that were unnecessary and/or higher they were permitted to claim subject to the California Code of Regulations.  Among other things, Defendants, and each of them billed Medi-Cal for unnecessary services.

143. Each Defendant knowingly submitted false claims for unnecessary services or services that were not performed.

144.  Each Defendant knowingly made, used, and caused to be made and used false certifications that the services for which it charged Medi-Cal were rendered in full compliance with all applicable statutes and regulations.

145. The conduct of Defendants, and each of them, violated Gov. Code section 12651, subd. (a)(1) and was a substantial factor in causing California to sustain damages in an amount according to proof pursuant to Cal. Gov. Code section 12651(a).

COMPLAINT

**WHEREFORE,** Plaintiffs respectfully request this Court grant judgment in their favor and award the following damages to the following parties and against Defendants:

To California:

(a)    Triple the amount of California's Damages;

(b)    Civil penalties of Ten Thousand Dollars ($10,000.00) for each false claim;

(c)    Prejudgment interest.

To Plaintiffs:

(a)    Recovery of costs, attorneys' fees and expenses;

(b)    Such other and further relief as the Court deems just and proper.

## THIRD CAUSE OF ACTION

### (Against All Defendants)

**California False Claims Act, Making or Using False Records or Statements To Obtain Payment or Approval of False Claims California Government Code §12651(a)((2)**

146.   Plaintiffs incorporate herein by reference the allegations stated in Paragraphs 1 through 145, inclusive, of this Complaint.

147.   Defendants, and each of them, knowingly (as defined in Cal. Gov. Code section 12650(b)(2)) made, used, or caused to be made or used false records or statements to get false claims paid or approved by California.

148.   Each Defendant knowingly made, used and or caused to be made and used false records and statements, including but not limited to bills, invoices, requests for reimbursement, and records of services, in order to obtain payment or approval of charges to the Medi-Cal program that were higher and/or unnecessary as they were permitted by law.

149.   Each Defendant knowingly submitted false claims for unnecessary services or services that were not performed.

150.    The conduct of Defendants, and each of them, violated Cal. Gov. Code section 12651(a)(2) and was a substantial factor in causing California to sustain damages in an amount according to proof pursuant to Cal. Gov. Code section 12651(a).

**WHEREFORE,** Plaintiffs respectfully request this Court grant judgment in their favor and award the following damages to the following parties and against Defendants;

To California:

(a)    Triple the amount of California's Damages;

(b)    Civil penalties of Ten Thousand Dollars ($10,000.00) for each false claim;

(c)    Prejudgment interest.

To Plaintiffs:

(a)    Recovery of costs, attorneys' fees and expenses;

(b)    Such other and further relief as the Court deems just and proper.

## FOURTH CAUSE OF ACTION

**(In the Alternative, Against All Defendants)**
**California False Claims Act, Retention of Proceeds**
**Of Inadvertently Submitted False Claims**
**California Government Code §12651(a)(8)**

151.    Plaintiffs incorporate herein by reference and realleges the allegations stated in Paragraphs 1 through 150, inclusive, of this Complaint.

152.    In the alternative, Defendants, and each of them, was a beneficiary of inadvertent submissions of false claims to California, subsequently discovering the falsity of the claims, and failing to disclose the false claims to California within a reasonable time after discovery of the false claims.

153.    Each Defendant was the beneficiary of false bills and charges to DHCS for amounts higher than permitted by law or that were completely unnecessary.

COMPLAINT

154.   Each defendant was the beneficiary of false claims for unnecessary or unauthorized services performed.

155.   Each Defendant was the beneficiary of false certifications that the services for which it charged Medi-Cal were rendered in full compliance with all applicable statutes.

156.   Each Defendant, upon discovering that it was the beneficiary of the submission of false claims for Medi-Cal reimbursement, failed to promptly disclose the overcharge or unnecessary charge to DHCS and make restitution therefor.

157.   The conduct of Defendants, and each of them, violated Cal. Gov. Code section 12651(a)(8) and was a substantial factor in causing California to sustain damages in an amount according to proof pursuant to Cal. Gov. Code section 12651(a).

**WHEREFORE,** Plaintiffs respectfully request this Court grant judgment in their favor and award the following damages to the following parties against Defendants;

To California:

(a)    Triple the amount of California's Damages;

(b)    Civil penalties of Ten Thousand Dollars ($10,000.00) for each false claim;

(c)    Prejudgment interest.

To Plaintiffs:

(a)    Recovery of costs, attorneys' fees and expenses;

(b)    Such other and further relief as the Court deems just and proper.

## **FIFTH CAUSE OF ACTION**

**(By Plaintiffs Marino, Edging and Palabrica Against All Defendants)**

**Unlawful Retaliation in Violation of Section 3730(h) of the False Claims Act**

158.   Plaintiffs Marino, Edging and Palabrica repeat and reallege each allegation contained in paragraphs 1 through 157 above as if fully set forth herein.

COMPLAINT

159.   31 U.S.C. § 3730(h) provides as follows:

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this Section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this Section, shall be entitled to all relief necessary to make the employee whole. Such relief shall include reinstatement with the seniority status such employee would have had but for the discrimination, two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. An employee may bring an action in the appropriate district court of the United States for the relief provided in this subsection.

160.   Plaintiffs' Marino and Edging's actions in advising Defendants of repeated failures to provide adequate care to its residents and of its wrongful Medicare practices constitute protected activities in furtherance of a Qui Tam action, as defined in Section 3730.

161.   Defendants retaliated against Plaintiffs Marino and Edging as a direct result of their protected activities.  The retaliation included but was not limited to verbal harassment, threats, failures to cease the fraudulent practices, subjecting Plaintiffs and residents to an unreasonable risk of harm and mental and emotional stress, and in the case of Plaintiffs Marino and Edging, termination from their employment.  In the case of Plaintiff Palabrica, the practices of Defendants and their unwillingness to change constituted a constructive discharge as these actions created a work environment so intolerable Plaintiff Palabrica had no other reasonable choice but to resign from her employment.

162.   Defendants' fraudulent acts as described herein constitute violations of 31 U.S.C. § 3729 *et. seq.*  Plaintiffs' efforts to disclose and correct Defendant's violations of the FCA as described herein, were made in furtherance of protected

1  activities under § 3730(h) of the FCA.

2      163.   Defendants knew or should have known that Plaintiffs were engaging in

3  such protected activities when they revealed the Defendants' failures in care to

4  management, CDPH, CMS and others.

5      **WHEREFORE,** Plaintiffs Marino, Edging and Palabrica respectfully request

6  this Court grant judgment in their favor and award the following damages against

7  Defendants;

8      (a)   Awarding Plaintiffs Marino, Edging and Palabrica front pay and two

9          times their back pay since February 2003,plus interest on their back pay

10          calculated at the prime rate, compounded annually;

11      (b)   Awarding Plaintiffs Marino, Edging and Palabrica compensatory

12          damages, including damages for emotional distress;

13      (c)   Awarding Plaintiffs Marino, Edging and Palabrica punitive damages in

14          an amount sufficient to deter defendants from committing such wrongful

15          acts in the future;

16      (d)   Awarding Plaintiffs Marino, Edging and Palabrica their reasonable

17          attorneys' fees and costs; and

18      (e)   Such further relief as this Court deems equitable and just.

19      **WHEREFORE** Plaintiffs respectfully request that this court grant judgment in

20  their favor and award the following damages against Defendants on all Causes of

21  Action.

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

1    164.   Further, the *Qui Tam* Plaintiffs, on their behalf, request that they receive

2  such maximum amount as permitted by law, of the proceeds of this action or

3  settlement of this action collected by the United States and California, plus an amount

4  of reasonable expenses incurred, plus reasonable attorneys' fees and costs of this

5  action.  The *Qui Tam* Plaintiffs request that their percentage be based upon the total

6  value recovered, including any amounts received from individuals or entities not

7  parties to this action.

8  DATED:  September 18, 2014          SALISBURY LEGAL CORP.

9

10

11                                 By: LAWRENCE J. SALISBURY, ESQ.

12                                 Attorneys for Plaintiffs UNITED STATES
                                   OF AMERICA, *ex rel* RACHEL COHEN;
13                                 KIM DEMELO; JULIA EDGING; LUCIA
                                   GARCIA; LINDSEY MARINO; and
14                                 JENNIFER PALABRICA

15

16                        **JURY TRIAL DEMAND**

17
         Plaintiffs hereby demand a jury trial.
18

19  DATED:  September 18, 2014          SALISBURY LEGAL CORP.

20

21

22                                 By: LAWRENCE J. SALISBURY, ESQ.

23                                 Attorneys for Plaintiffs UNITED STATES
                                   OF AMERICA, *ex rel* RACHEL COHEN;
24                                 KIM DEMELO; JULIA EDGING; LUCIA
                                   GARCIA; LINDSEY MARINO; and
25                                 JENNIFER PALABRICA

26

27

28

                                   39                            COMPLAINT

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Central District of California

UNITED STATES OF AMERICA -ex-rel-;
Rachel Cohen; Kim DeMelo; Julia Edging; Lucia
Garcia; Lindsey Marino; and Jennifer Palabrica )
                *Plaintiff(s)*                  )
                                                 )
                    v.                           )    Civil Action No.
                                                 )
Premier B.H. Inc.; M.O. Jacob Health Care Center, )   LACV14-7354 MWF (R2x)
  LP; Jacob Health Care Center, LP; Community    )
Convalescent Hospital Of La Mesa dba Community   )
  Care Center Of La Mesa; M.O. Community         )
Convalescent Hospital Of La Mesa, LP; Eldorado   )
 Care Center, LP; Paramount Meadows Nursing, LP; )
  Norwalk Meadows Nursing Center, LP; Pasadena   )
  Meadows Nursing Center, LP; Panorama Meadows   )
  Nursing Center, LP; Meadows Management, Inc.;  )
Jacob Health Care Advisors, LLC; Pnina Graff and;
                Jacob Graff
                *Defendant(s)*

### SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:
Salisbury Legal Corp., Lawrence J. Salisbury, Esq.; 656 Fifth Avenue, Suite R, San Diego, CA 92101
Law Offices of Mark A. Redmond, Mark A. Redmond, Esq.; 555 Capitol Mall, Suite 770, Sacramento, CA 95814

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

SEP 19 2014

CLERK OF COURT

1174

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

COPY

**I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ )

Rachel Cohen; Kim DeMelo; Julia Edging; Lucia Garcia; Lindsey Marino; and Jennifer Palabrica

**DEFENDANTS** ( Check box if you are representing yourself ☐ )

Premier B.H. Inc., et al.

**(b) County of Residence of First Listed Plaintiff**   San Diego
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**County of Residence of First Listed Defendant**   Los Angeles
*(IN U.S. PLAINTIFF CASES ONLY)*

**(c) Attorneys** *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information.

Salisbury Legal Corp.; Lawrence J. Salisbury, Esq.
656 Fifth Avenue, Suite R, San Diego, CA 92101; (619) 241-2760

**Attorneys** *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information.

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☒ 3. Federal Question (U.S. Government Not a Party)

☐ 2. U.S. Government Defendant

☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding
☐ 2. Removed from State Court
☐ 3. Remanded from Appellate Court
☐ 4. Reinstated or Reopened
☐ 5. Transferred from Another District (Specify)
☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No   (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No     ☐ **MONEY DEMANDED IN COMPLAINT: $**

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
This is a qui tam complaint under the False Claims Act (31 U.S.C. § 3729 et. seq.) and California False Claims Act (Cal. Gov. Code § 12650, et seq.).

**VII. NATURE OF SUIT** (Place an X in one box only.)

| | | | | | |
|---|---|---|---|---|---|
| ☒ 375 False Claims Act | 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee ☐ 510 Motions to Vacate Sentence | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 530 General | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | | | ☐ 535 Death Penalty | |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 370 Other Fraud | | | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights ☐ 555 Prison Condition | ☐ 863 DIWC/DIWW (405 (g)) ☐ 864 SSID Title XVI |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 385 Property Damage Product Liability | ☐ 560 Civil Detainee Conditions of Confinement | ☐ 865 RSI (405 (g)) |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | | | |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 690 Other | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 891 Agricultural Acts | | ☐ 355 Motor Vehicle Product Liability | | | |
| ☐ 893 Environmental Matters | ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | ☐ 710 Fair Labor Standards Act | |
| ☐ 895 Freedom of Info. Act | ☐ 195 Contract Product Liability | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| ☐ 896 Arbitration | ☐ 196 Franchise | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/ Accommodations | ☐ 740 Railway Labor Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | ☐ 220 Foreclosure | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

**FOR OFFICE USE ONLY:**   Case Number:   **LACV14-7354**

CV-71 (06/14)                          CIVIL COVER SHEET                          Page 1 of 3

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**VIII. VENUE:** Your answers to the questions below will determine the division of the Court to which this case will be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| QUESTION A: Was this case removed from state court? <br> ☐ Yes  ☒ No <br><br> If "no," skip to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question E, below, and continue from there. | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| | ☐ Los Angeles, Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | Eastern |

| QUESTION B: Is the United States, or one of its agencies or employees, a PLAINTIFF in this action? <br><br> ☐ Yes  ☒ No <br><br> If "no," skip to Question C. If "yes," answer Question B.1, at right. | **B.1.** Do 50% or more of the defendants who reside in the district reside in Orange Co.? <br><br> *check one of the boxes to the right* ➡ | ☐ YES. Your case will initially be assigned to the Southern Division. Enter "Southern" in response to Question E, below, and continue from there. |
| | | ☐ NO. Continue to Question B.2. |
| | **B.2.** Do 50% or more of the defendants who reside in the district reside in Riverside and/or San Bernardino Counties? (Consider the two counties together.) <br><br> *check one of the boxes to the right* ➡ | ☐ YES. Your case will initially be assigned to the Eastern Division. Enter "Eastern" in response to Question E, below, and continue from there. |
| | | ☐ NO. Your case will initially be assigned to the Western Division. Enter "Western" in response to Question E, below, and continue from there. |

| QUESTION C: Is the United States, or one of its agencies or employees, a DEFENDANT in this action? <br><br> ☐ Yes  ☒ No <br><br> If "no," skip to Question D. If "yes," answer Question C.1, at right. | **C.1.** Do 50% or more of the plaintiffs who reside in the district reside in Orange Co.? <br><br> *check one of the boxes to the right* ➡ | ☐ YES. Your case will initially be assigned to the Southern Division. Enter "Southern" in response to Question E, below, and continue from there. |
| | | ☐ NO. Continue to Question C.2. |
| | **C.2.** Do 50% or more of the plaintiffs who reside in the district reside in Riverside and/or San Bernardino Counties? (Consider the two counties together.) <br><br> *check one of the boxes to the right* ➡ | ☐ YES. Your case will initially be assigned to the Eastern Division. Enter "Eastern" in response to Question E, below, and continue from there. |
| | | ☐ NO. Your case will initially be assigned to the Western Division. Enter "Western" in response to Question E, below, and continue from there. |

| QUESTION D: Location of plaintiffs and defendants? | A. Orange County | B. Riverside or San Bernardino County | C. Los Angeles, Ventura, Santa Barbara, or San Luis Obispo County |
|---|---|---|---|
| Indicate the location(s) in which 50% or more of *plaintiffs who reside in this district* reside. (Check up to two boxes, or leave blank if none of these choices apply.) | ☐ | ☐ | ☐ |
| Indicate the location(s) in which 50% or more of *defendants who reside in this district* reside. (Check up to two boxes, or leave blank if none of these choices apply.) | ☐ | ☐ | ☐ |

| **D.1. Is there at least one answer in Column A?** | **D.2. Is there at least one answer in Column B?** |
|---|---|
| ☐ Yes  ☒ No | ☐ Yes  ☒ No |
| If "yes," your case will initially be assigned to the <br> SOUTHERN DIVISION. <br> Enter "Southern" in response to Question E, below, and continue from there. <br> If "no," go to question D2 to the right. ➡ | If "yes," your case will initially be assigned to the <br> EASTERN DIVISION. <br> Enter "Eastern" in response to Question E, below. <br> If "no," your case will be assigned to the WESTERN DIVISION. <br> Enter "Western" in response to Question E, below. ⬇ |

| QUESTION E: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, C, or D above: ➡ | WESTERN |

| QUESTION F: Northern Counties? | |
|---|---|
| Do 50% or more of plaintiffs or defendants in this district reside in Ventura, Santa Barbara, or San Luis Obispo counties? | ☐ Yes  ☒ No |

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL COVER SHEET**

**IX(a). IDENTICAL CASES:** Has this action been previously filed **in this court**?           ☒ NO           ☐ YES

If yes, list case number(s): _____

**IX(b). RELATED CASES:** Is this case related (as defined below) to any cases previously filed **in this court**?           ☒ NO           ☐ YES

If yes, list case number(s): _____

Civil cases are related when they:

☐ A. Arise from the same or closely related transactions, happening, or event;

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges.

Check all boxes that apply. That cases may involve the same patent, trademark, or copyright is not, in itself, sufficient to deem cases related.

| **X. SIGNATURE OF ATTORNEY (OR SELF-REPRESENTED LITIGANT):** | DATE: 9/18/14 |
| --- | --- |

**Notice to Counsel/Parties:** The submission of this Civil Cover Sheet is required by Local Rule 3-1. This Form CV-71 and the information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. For more detailed instructions, see separate instruction sheet (CV-071A).

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
| --- | --- | --- |
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |